IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

KAREN J. LEWIS

      Plaintiff,           CV-10-63-SU

   v.              FINDINGS AND
                 RECOMMENDATION
MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

SULLIVAN, Magistrate Judge:

   Claimant, Karen J. Lewis ("Lewis"), brings this action pursuant to the Social Security Act

(the "Act"), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner

of Social Security ("Commissioner").  The Commissioner denied Lewis's application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Ac, 42 U.S.C. §§ 416,

423, and for Supplemental Security Income ("SSI") disability benefits under Title XVI of the

1 - FINDINGS AND RECOMMENDATION

Act, 42 U.S.C. § 1382(c).  For the reasons set forth below, the Commissioner's decision should be REVERSED and REMANDED for the immediate calculation and award of benefits.

## BACKGROUND

Lewis was born on April 14, 1959.  R. at 325.  She was 47 years old at the time of the first hearing, and was 48 years old at the time of the second hearing.  She has a high school education, and has worked as a bartender, waitress, fish cannery processor, and cherry sorter.  R. at 19, 28.

Lewis protectively filed her application for DIB and SSI benefits on March 8, 2004.  R. at 16.  She alleged disability beginning January 30, 2004.  Id.  On February 6, 2007, Lewis appeared and testified at a hearing before Dan R. Hyatt, the administrative law judge ("ALJ").  Id.  Later, on May 8, 2007, another hearing was held before the ALJ.  Although Lewis was represented by counsel, she was not present at the May 8, 2007, hearing.  On July 25, 2007, the ALJ ruled that Lewis was not disabled within the meaning of the Act.  R. at 28.  The Appeals Council denied Lewis's request for review.  R. at 6, 11.  The ALJ's decision thus became the final agency decision.  *See* 20 C.F.R. §§ 404.981, 416.1481, 422.210 (2005).

## DISABILITY ANALYSIS

The Commissioner has established a five-step sequential process for determining whether a person is disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1502, 416.920.  First the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S. at 140; 20 C.F.R. §§ 404.1520(b), 416.920(b).

2 - FINDINGS AND RECOMMENDATION

In step two the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Bowen v. Yuckert*, 482 U.S. at 140-41; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three the Commissioner determines whether the impairment "meets or equals" one of a number of listed impairments under 20 C.F.R. part 404, Subpart P, Appendix 1 in that the Secretary acknowledges are so severe as to preclude substantial gainful activity." 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Bowen v. Yuckert*, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant has sufficient residual functional capacity ("RFC") despite the impairment or various impairments to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, she is not disabled. If she cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Bowen v. Yuckert*, 482 U.S. at 141-42; *see also* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). If the Commissioner meets this burden and proves that the claimant is able to perform other work existing in the national economy, she is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S FINDINGS

At step one, the ALJ determined Lewis had not engaged in substantial gainful activity since her alleged disability onset date. R. at 18, Finding 2. At step two, the ALJ found Lewis had severe and non-severe impairments. Id., Finding 3. Specifically, he found Lewis's alleged impairments of fibromyalgia, irritable bowel syndrome, depression, and somatoform disorder

were non-severe impairments.  R. at 19, Finding 3.  He also found Lewis's anxiety disorder,

borderline intellectual functioning, personality disorder, and drug abuse were severe

impairments.[1]  Id., Finding 3.  These findings are in dispute.

At step three, the ALJ found Lewis's impairments did not meet or equal the requirements

of a listed impairment pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. at 24, Finding

4.  Regarding Lewis's RFC, the ALJ found Lewis had the capacity to perform a full range of

work at all exertional levels with vocational non-exertional limitations.  R. at 25, Finding 5; 20

C.F.R. §§ 404.1529, 416.929.  Lewis was limited to occasional interaction with the general

public and in performing team-type tasks with co-workers.  R. at 27, Finding 5.  The ALJ also

found Lewis limited to simple, routine, repetitive 1-2-3 step type work at unskilled levels.  R. at

27.  In formulating Lewis's RFC, the ALJ found Lewis's allegations concerning the intensity,

persistence, and limiting effects of her symptoms not entirely credible because of her

evasiveness, secrecy, inconsistencies in alleged symptoms, and vagueness about current use of

both drugs and alcohol.  Id.  These findings are in dispute.

At step four, the ALJ found Lewis capable of performing her past relevant work of fish

cannery processing and cherry sorting based on the impartial vocational expert testimony.  R. at

28, Finding 6.  This finding is at issue.  Finally, because the ALJ found Lewis was not disabled at

step four, he did not make a finding at step five.  R. at 28, Finding 7; 20 C.F.R. §§

404.1520(a)(4), 419.920(a)(4) ("If we can find that you are disabled or not disabled at a step, we

make our determination or decision and we do not go on to the next step.").

---

[1] Although Lewis did not allege impairments due to fibromyalgia, borderline intellectual
functioning, or personality disorder in her applications for DIB and SSI,  R. at 19, the ALJ
considered them when making his determination.

4 - FINDINGS AND RECOMMENDATION

**STANDARD OF REVIEW**

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. *See Howard v. Heckler*, 782 F.2d 1484, 1487 (9th Cir. 1986); *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). "Where the evidence as a whole can support either a grant or a denial, [a court] may not substitute [its] judgment for the ALJ's." *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) (citation omitted).

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler*, 782 F.2d at 1486. To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A).

**DISCUSSION**

**I. Lewis's Allegations of Error**

Lewis argues the ALJ incorrectly found Lewis did not meet listing 12.05C ("Listing 12.05C") and listing 12.08 ("Listing 12.08") of 20 C.F.R. Part 404, Subpart P, Appendix 1. Lewis also contends the ALJ did not give sufficient reasons to reject multiple opinions of

physicians.  Lastly, Lewis asserts the ALJ did not give sufficient reasons to reject her complaints.

I address each argument in turn.

    A. **Satisfaction of Listing 12.05C and 12.08**

        1. **Listing 12.05C**

Lewis argues the ALJ erred when finding that Lewis did not meet Listing 12.05C.  This

court agrees.

Pursuant to 20 C.F.R. § 404.1520(a)(4)(iii), if a claimant has "an impairment(s) that

meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration

requirement," the Commission will find the claimant "disabled."  Listing 12.05 describes mental

retardation as a condition characterized by "significantly subaverage general intellectual

functioning with deficits in adaptive functioning initially manifested during the developmental

period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  The

required level of severity for this disorder is met when the requirements in . . . C . . . are

satisfied."  The requirements in C are met when there is a "[a] valid verbal, performance, or full

scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and

significant work-related limitation of function . . . ."  Listing 12.05C.  In short, to meet or equal

Listing 12.05C, a claimant "must show three things: (1) a valid verbal, performance or full scale

IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other

mental impairment imposing an additional and significant work-related limitation of function.

*Phelps v. Barnhart*, CV. 04-1657-PK, at *8 (D. Or. 2006) (citing *Maresh v. Barnhart*, 438 F.3d

897, 899 (8th Cir. 2006)).

Here the ALJ found Lewis had severe mental impairments of anxiety disorder and personality disorder, thereby satisfying the third requirement.  R. at 19.  Additionally, it is undisputed that Lewis tested as having a verbal IQ of 69 on the Weschler Adult Intelligence Scale test ("WAIS-III").  R. at 453.  The Commissioner asserts Lewis's verbal IQ score of 69 is invalid because Lewis tested as having a performance scale IQ of 84 on the WAIS-III.  However, the appendix to the regulations provides that "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, [the Commissioner] use[s] the lowest of these in conjunction with 12.05."  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(6)(c).  In addition, the Ninth Circuit has also suggested that only a claimant's lowest score is relevant to Listing 12.05C.  *See Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1987) (agreeing with ALJ's finding that claimant had a valid verbal, performance, or full scale IQ of 60 to 69 where claimant's IQ scores "ranged from a high of 76 to a low of 69").

Although the Commissioner asserts there is no basis to assume Lewis has had this IQ level before age 22, a claimant is not required to show evidence from the developmental period to establish that the impairment began before the age of 22.  *Phelps v. Barnhart*, CV. 04-1657-PK, at *10 (citing 65 Fed. Reg. 50746-01, 50753 (2000)).  Rather, the final rules permit the Social Security Administration to use judgment, based on current evidence, to infer when the impairment began.  *Id.*  "Absent evidence to the contrary, a person's IQ is presumed to remain stable over time."  *Id.* (citing *Maresh v. Barnhart*, 438 F.3d at 900).

7 - FINDINGS AND RECOMMENDATION

The Commissioner also asserts Lewis's lack of special education classes[2], ability to graduate timely from high school, and previous work experience suggest she did not have deficits in adaptive functioning before age 22.  This court disagrees.  When determining whether a claimant demonstrates deficits in adaptive functioning, courts consider a variety of factors, including claimant's poor academic performance and work history.  *See, e.g.*, *Phelps v. Barnhart*, CV. 04-1657-PK, at *12 (D. Or. 2006) (considering claimant "consistently reported and testified that school was difficult for her and that she struggled with reading, memory and spelling"); *Payne v. Astrue*, No. CV-08-1753-PHX-LOA, 2010 WL 654319, at *11 (D. Ariz. 2010) (considering claimant's education and work history when determining whether claimant "had no deficits in her adaptive functioning prior to age 22").

Here a psychological diagnostic exam performed on June 28, 2004, by Pamela Miller, Ph.D, a licensed clinical psychologist, states Lewis "struggled all through school." R. at 325.  It also provides her "mother believed that [she] should have been held back" and that "[d]uring her senior year, [she] received some remedial help in order to complete her necessary schoolwork . . . [and] [w]ith this extra help, [she] was able to graduate from high school." Id.  In addition, a psychological evaluation performed on November 15, 2006, by Lawrence Lyon, Ph.D, shows Lewis "received special help in writing in about the fourth grade . . . [and] was able to graduate in 1977 with her class because of the help she received from the special program which helped her catch up on her credits." R. at 451.  After graduation, Lewis attended "fashion design school

---

[2] Lewis did not take any special education classes.  Lewis stated in a psychological diagnostic exam on June 28, 2004, that she "was never in special education." R. at 325.  She also stated in her application for DIB and SSI benefits that she has never attended "special education classes." R. at 86.

. . . but did not make it despite her sister's attempts to tutor her." Id. Lewis's inconsistent work history also demonstrates that she meets the diagnostic requirements for Listing 12.05C. The record shows that in the past Lewis has worked short stints as a janitor, "nursery worker," hostess, waitress, cashier, "nurse's aid," cook, bartender, cherry sorter, and fish cannery processor. R. at 119, 128.

Although the Commissioner urges this court to consider "Dr. Davis' general proposition that [Lewis's] drug abuse *could have* affected her November 2006 IQ score," Def.'s Br. at 8 (emphasis added), there is no evidence supporting the Commissioner's assertion that Lewis's alleged drug use affected her IQ score. To the contrary, the record reflects Lewis was not abusing drugs at the time of her November 2006 test where Dr. Davis testified that he had sent out a urinalysis for Lewis, but it only "came back positive for benzodiazepines," a result of her Lorazepam prescription, and came back negative for marijuana. R. at 617. Further, the mere possibility that a claimant is abusing drugs, as here, does not necessarily invalidate a claimant's IQ scores. *See Rhodes v. Astrue*, No. 3:09-cv-00810, 2010 WL 3360091, at *3 (S.D. W.Va. 2010) (concluding claimant's IQ scores as valid despite claimant's reported history of drug abuse); *Williams v. Astrue*, 692 F. Supp. 2d 1331, 1338-39 (N.D. Fla. 2010) (holding ALJ's determination that claimant's low IQ scores "could be" the result of other factors, including her drug and alcohol use, is pure speculation, and ALJ erred by arbitrarily substituting his own hunch or intuition for the diagnosis of a medical professional); *Luna v. Astrue*, No. C08-5581RJB-KLS, 2009 WL 1763305, at *4, 7 (W.D. Wash. 2009) (remanding for further consideration, in part, because the record was "not entirely clear the exact effect plaintiff's substance abuse had on his intellectual functioning" where "ALJ found that IQ testing scores contained in the record . . .

9 - FINDINGS AND RECOMMENDATION

were obtained at a time when plaintiff was 'actively using alcohol and/or drugs,' rendering those scores invalid . . . ."); *Holmes v. Apfel*, No. 98 C 5087, 1999 WL 731769, at *4-5 (N.D. Ill. 1999) (holding ALJ's conclusion that claimant's IQ score was invalid constituted "pure speculation based on [claimant's] history of drug and alcohol abuse" because there was "no evidence in the record that [claimant's] history of drinking and drug abuse either could have or did in fact affect his IQ test results").

In sum, there is substantial evidence in the record showing Lewis met the requirements for Listing 12.05C. The ALJ's finding that Lewis did not meet or equal Listing 12.05C was legal error and was not based upon substantial evidence.

### 2. Listing 12.08

Lewis argues the ALJ erred in not accepting Dr. Davis's finding. Dr. Davis is an impartial medical expert, who testified that Lewis met Listing 12.08. This court agrees.

Listing 12.08 addresses "personality disorders." Pursuant to Listing 12.08, the "required level of severity . . . is met when the requirements in both A and B are satisfied."[3] The requirements in B are met when the claimant satisfies at least two of the following:

"1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration." Listing 12.08B.

Here Dr. Davis testified that Lewis met the third requirement, stating Lewis's "[c]oncentration, persistence or pace" is "marked." R. at 624. Regarding the second

---

[3] The parties do not dispute whether the requirements in A have been satisfied.

requirement, Dr. Davis testified that Lewis's "social functioning" was "moderate."  However, when later asked whether there could be times when Lewis's "social functioning" could rise to "marked," he replied, "I'm sure.  She becomes irritable sometimes."  R. at 624, 626.

"An ALJ must explain why he has rejected uncontroverted medical evidence."  *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir.1984); *see also Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) ("The Commissioner may reject the opinion of a non-examining physician by reference to specific evidence in the medical record.").  In spite of Dr. Davis's testimony, and without any reference to Dr. Davis's opinion, here the ALJ concluded Lewis's "mental impairments do not meet or medically equal the requirements" of Listing 12.08, R. at 25, thereby implicitly rejecting or ignoring the opinion of Dr. Davis without any explanation at all.  Based on Dr. Davis's findings, the ALJ erred by concluding Lewis did not meet Listing 12.08.  *See Smolen v. Chater*, 80 F.3d 1273, 1286 (9th Cir. 1996) (ALJ effectively rejects physician's opinion where he ignores it and makes contrary findings, and the "failure to offer reasons for doing so [is] legal error").

## B. Rejection of the Opinions of Medical Providers

Lewis asserts the ALJ failed to give clear and convincing reasons when rejecting the opinions of multiple medical providers.  Although a treating physician's opinion is generally afforded the greatest weight in disability cases, an ALJ may reject an uncontradicted opinion of a treating or examining doctor[4] if the ALJ states clear and convincing reasons that are supported by

---

[4] "There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).  "Treating physicians" treat the claimant, "examining physicians" examine but do not treat the claimant, and "nonexamining physicians"

(continued...)

substantial evidence. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). If a treating or

examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it

by providing specific and legitimate reasons that are supported by substantial evidence. *Id.*

However, "[t]he ALJ need not accept the opinion of any physician, including a treating physician,

if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v.*

*Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

### 1. Greg Melby, M.D.

#### a. Dr. Melby's Letter

The ALJ erred by assigning "no weight" to Dr. Melby's letter dated February 5, 2007.[5]

The letter states, in pertinent part:

> [Lewis] had a Social Security evaluation by a psychologist and I agree with his
> evaluation and diagnoses, including mood disorder, anxiety disorder, somatoform
> disorder, borderline intellectual functioning, and personality disorder with passive
> aggressive, paranoid, and avoidant features. She does have marked to extreme
> impairment in social functioning. She is abrasive and tends to get into verbal
> conflicts, and does things that make people get upset at her.
> Regarding her concentration, her persistence and pace are markedly impaired. She
> has very tangential speech and flight of ideas.
> I do not believe that Karen is intentionally trying to be ill. She is not malingering and
> she is not exaggerating. I do not believe she understands her illness.
> Karen in my opinion would be unable to function in a regular job due to her
> impairments and would easily miss more than 50% of her work days.

R. at 503.

---

[4](...continued)
neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

[5] The ALJ considered Dr. Melby's treatment notes, but rejected his opinions in the
February 5, 2007, letter. R. at 22.

Here Dr. Melby treated Lewis from March 2004 to February 5, 2007, the date he wrote

the letter.  R. at 314-320, 476-570.  The ALJ reasoned that he gave Dr. Melby's letter "no weight"

because he referenced psychological impairments for which he did not treat and for which he was

not licensed to treat.  R. at 22.  The Commissioner now concedes this was error because Dr.

Melby treated Lewis's mental impairments[6], and because Dr. Melby qualifies as an acceptable

medical source whose opinion the ALJ must consider pursuant to 20 C.F.R. § 404.1527(a)(2).

Def.'s Br. at 13; 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians

and psychologists or other acceptable medical sources that reflect judgments about the nature and

severity of [the claimant's] impairment(s) . . . .").

The remaining reason the ALJ provided when giving "no weight" to Dr. Melby's letter,

and the rationale on which the Commissioner now relies, is neither "specific and legitimate," nor

is it supported by substantial evidence.[7]  The ALJ rejected Dr. Melby's letter because he

"ignor[ed] the fact that the claimant had worked as a hotel cleaner and was currently working as a

bartender"[8] when determining Lewis "will 'miss more than 50% of her work days.'"  R. at 22.

---

[6] Dr. Melby diagnosed Lewis with somatoform disorder, anxiety, depression, and chronic pain.  R. at 316.  He prescribed Lexapro to address Lewis's depression and anxiety.  R. at 315. He also prescribed Valium and Ativan to address Lewis's anxiety and depression.  R. at 490.

[7] Although the Commissioner does not argue that the ALJ here was only required to provide "specific and legitimate" reasons, the record shows Dr. Miller "ruled out" somatoform disorder, R. at 328, thereby contradicting Dr. Melby's diagnosis of somatoform disorder. Accordingly, the ALJ could only reject Dr. Melby's opinion by providing "specific and legitimate" reasons.

[8] Lewis worked approximately 20 to 25 hours per week from July 6, 2006, to October 2006 at the "Shilo" making beds, dusting, and cleaning toilets and floors.  R. at 167, 594.  Lewis testified she left the Shilo because "[i]t was hard on [her] body, and . . . to relocate to Portland." R. at 594.  From October to December 2006, Lewis then worked approximately 25 hours per

(continued...)

13 - FINDINGS AND RECOMMENDATION

The Commissioner asserts Dr. Melby's opinion that Lewis would easily miss more than 50% of her workdays contradicts her ability to work from 2005 to 2007, and therefore the ALJ properly rejected Dr. Melby's letter.  This court disagrees.

The record does not reflect that Dr. Melby ignored Lewis's work history.  To the contrary, Dr. Melby's notes on May 30, 2006, indicate that he knew Lewis was working.  They state, "[Lewis is] in today for a follow up on her persistent pain.  Currently she's doing fairly well.  She's working.  She's got a job at a hotel doing cleaning at this point." R. at 508.  Additionally, the record is void of any facts indicating how many workdays Lewis missed or whether Lewis missed any workdays at all.

The Commissioner also appears to assert the ALJ properly rejected Dr. Melby's letter because many of Dr. Melby's treatment notes showed no basis for Lewis's assessed limitations, including his diagnosis for muscle spasms, and because Dr. Melby could not provide any supportable diagnosis to explain Lewis's alleged pain.  Def.'s Br. at 14.  However, these were not reasons articulated by the ALJ.  Such post hoc explanations are insufficient to cure the ALJ's error.  *See, e.g.*, *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) (concluding "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ-not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking"); *see also*

_____

[8](...continued)
week at Meyers Court, where she worked as a housekeeper.  R. at 450, 594.  She left Meyers Court to "[t]o go to work at the Ace Tavern" as a bartender.  R. at 595.  Lewis was employed at Ace Tavern for approximately one month from December 2006 to January 2007.  She testified she was fired from Ace Tavern for "looking for other work."  R. at 596.  After leaving Ace Tavern, and at the time of the May 8, 2007, hearing, Lewis worked at a "different tavern" working 32 hours per week.  R. at 604.

14 - FINDINGS AND RECOMMENDATION

*Berjettej v. Astrue*, No. 09-CV-892-BR, 2010 WL 3056799, at *6 (D. Or. 2010) (holding that

although Commissioner provided reasons the ALJ might have relied on as support for rejecting

certain testimony, the "ALJ did not set out those reasons in his opinion," and therefore the court

could not affirm the decision because it was on a ground the agency did not invoke in making its

decision) (citing *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006)).

### b. <u>Lewis's Somatoform Disorder and Fibromyalgia Diagnoses</u>

Lewis also contends the ALJ erred by finding her somatoform disorder and fibromyalgia

"non-severe."  The ALJ stated as follows:

> Based on all of the medical evidence of record set forth above, the undersigned finds
> the claimant has *no established medical etiology, medical signs or clinical findings*
> to corroborate her persistent complaints of chronic, diffuse and vaguely described as
> chronic pain.  What the record does reflect is a history of claimant seeking out
> multiple physicians with demonstrated opiate/narcotic/benzodiazepine medication
> drug seeking behavior.  In conclusion, the undersigned finds the claimant has no
> physical functional limitations on the basis of her alleged "chronic pain."
> Accordingly, the undersigned finds the claimant's alleged "chronical abdominal pain;
> irritable bowel syndrome; fibromyalgia and somatoform disorder are non-severe,
> posing no limitations upon her in her capacity to do basic work activities for any
> prolonged period up to 12-continuous months.

R at. 22 (emphasis added).

The Ninth Circuit, however, has recognized that there is no "objective" method for

measuring pain.  *See, e.g.*, *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d

863, 872-73 (9th Cir. 2008) (noting that "case law in Social Security disability cases" recognize

"individual reactions to pain are subjective and not easily determined by reference to objective

measurements") (citations omitted).  Moreover, the Ninth Circuit has also recognized that

fibromyalgia's "cause or causes are unknown, there is no cure, and, of greatest importance to

disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence

or severity of fibromyalgia." *Rollins v. Massanari*, 261 F.3d 853, 855 (9th Cir. 2001) (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)).  Accordingly, the ALJ erred by effectively requiring "objective" evidence for a disease that eludes such measurement." *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004) (citation omitted).

Similarly, the absence of objective findings or "particular diagnoses or etiology" to account for an individual's complaints is also inherent in the very nature of a somatoform disorder. *See Day v. Astrue*, Civil No. 08-944-JE, 2010 WL 331777, at *14 (D. Or. 2010). "Those suffering from a somatoform disorder experience physical symptoms for which there are no demonstrable organic findings, and which are presumed to be linked to psychological factors." *Id.* (citation omitted).  As such, the ALJ may not, as he did here, reasonably expect that a claimant's allegations of physical limitations and pain would be confined to causes concretely identified by objective physical examination and findings, because those with a somatoform disorder experience symptoms that are psychologically enhanced.  *Id.*

The Commissioner now asserts the ALJ had proper grounds to dismiss Dr. Melby's diagnosis of somatoform disorder and fibromyalgia because it was contradicted by Dr. Davis, the impartial medical expert psychologist[9], and because Lewis was able to work as a housekeeper, bartender, and waitress.  However, these were not the reasons articulated by the ALJ, and such post hoc rationalizations are unpersuasive. *See, e.g.*, *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d at 1225.  Further, "[a]n ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she or he provides 'specific and

_____

[9] Dr. Davis testified he had "doubts about the somotoform, [sic] even though her treating physician th[ought] it was there . . . ."  R. at 621

legitimate' reasons supported by substantial evidence in the record." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citation omitted).  Here Dr. Davis's testimony did not amount to a contradiction of Dr. Melby's medical opinion.  Even assuming, *arguendo*, that Dr. Davis's testimony did contradict Dr. Melby's diagnosis of somatoform disorder and fibromyalgia, Lewis's irregular work history does not amount to a "specific and legitimate" reason, nor is its supported by substantial evidence, especially when considering the fact that Dr. Melby treated Lewis for over two years, and repeatedly diagnosed Lewis as having somatoform disorder, fibromyalgia, and chronic pain.[10]

In sum, the ALJ's error here was giving "no weight" to a treating doctor's opinion, which is entitled to deference and often dictates the outcome of a case.  *See Polanco v. Astrue*, No. CV 09-3050-PK, 2011 WL 128790, at *2 (C.D. Cal. 2011).  Accordingly, the ALJ committed legal error by failing to provide "specific and legitimate" reasons supported by substantial evidence when rejecting the opinion of Dr. Melby, Lewis's treating physician.  *See Lester v. Chater*, 81 F.3d at 830.

## 2. Peter Peruzzo, M.D., and Laura Perri, M.D.

---

[10] Dr. Melby diagnosed Lewis with somatoform disorder, depression, and chronic pain on March 31, 2004.  R. at 316.  On April 16, 2004, and November 1, 2004, he diagnosed Lewis with somatoform disorder.  R. at 314, 493.  On July 25, 2005, Dr. Melby noted Lewis's chronic pain, and diagnosed her with fibromyalgia.  R. at 527.  He also opined on September12, 2005, that Lewis "has depression causing her chronic somatic complaints," and prescribed Remeron for her depression and Percocet for her chronic pain.  R. at 523.  On October 14, 2005, Dr. Melby diagnosed Lewis with mouth pain, chronic headaches, and somatoform disorder, R. at 518, and on January 9, 2006, he opined that her chronic pain is a somatoform pain.  R. at 513.  On January 23, 2006, Dr. Melby prescribed Oxycodone for Lewis's chronic pain, R. at 512, and on February 28, 2006, he diagnosed her with chronic pain "with probable somatiform [sic] pain disorder."  R. at 511.  In a letter dated February 5, 2007, Dr. Melby stated that he has treated Lewis for "anxiety, depression, and somatoform pain disorder."  R. at 503.  He also agreed with the Social Security evaluation, which diagnosed her with, among other things, somatoform disorder.  Id.

17 - FINDINGS AND RECOMMENDATION

Lewis asserts the ALJ did not mention the opinions or diagnoses of Dr. Peruzzo[11] or Dr.

Perri.[12]  However, "medical opinions of any physician, treating or examining, which predate the

alleged onset of disability are not considered substantial evidence."  *E.g.*,  *Carmickle v. Comm'r*

*Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (concluding "[m]edical opinions that

predate the alleged onset of disability are of limited relevance") (citation omitted); *Burkhart v.*

*Bowen*, 856 F.2d 1335, 1340 n.1 (9th Cir. 1988) (concluding ALJ correctly rejected medical

evidence because it predated the relevant time period); *Ingham v. Astrue*, No. SA CV 09-931-SH,

2010 WL 1875651, at *3 (C.D. Cal. May 10, 2010) (concluding "medical opinions of any

physician, treating or examining, which predate the alleged onset of disability are not considered

substantial evidence") (citation omitted).  Accordingly, the ALJ properly declined to address Dr.

Peruzzo and Dr. Perri's opinions, which predated Lewis's alleged onset of disability in January

30, 2004.  Moreover, here Lewis "concedes that the opinions of Dr. Peruzzo and Dr. Perri

regarding disability are outside the designated time period and . . . are not essential to the

disability determination . . . ."  Reply at 8-9.

### 3. Pamela Miller, Ph.D.

Lewis contends the ALJ erred by misstating Dr. Miller's Global Assessment of

Functioning ("GAF").[13]  R. at 23.  Here Lewis underwent a consultative psychological evaluation

---

[11] Dr. Peruzzo saw Lewis several times in 2001 and 2003 for her back pain.  R. at 151, 263, 268, 287.

[12] Dr. Perri assessed Lewis with severe anxiety on July 29, 2002.  R. at 409.

[13] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment."  *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998).

and testing with Dr. Miller on June 28, 2004. R. at 22. In reviewing Dr. Miller's opinion, the

ALJ stated, "Dr. Miller gave the claimant in interim global assessment of functioning (GAF)

score (i.e. not expected to prolong beyond a few weeks to months) of 48[14]." R. at 23. Lewis

argues there is nothing in the record indicating that Lewis's GAF assessment was "not expected

to prolong beyond a few weeks to months." Id.

Although the Commissioner correctly points out that Dr. Miller stated that the "results of

[the] assessment seem[ed] to be a reliable and valid reflection of Ms. Lewis's *current*

functioning," R at 328 (emphasis added), nowhere in the record does Dr. Miller indicate that her

assessment of Lewis, including her GAF score, was "not expected to prolong beyond a few

weeks to months."[15]  The ALJ's misstatement of the evidence here constitutes error. *See, e.g.*,

*Thompson v. Astrue*, No. ED CV 09-2255-PLA, 2011 WL 164323, at *8 (C.D. Cal. 2011) (citing

*Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)).

---

[14] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders p. 32 (4th ed. 2000) ("DSM-IV").

[15] Several courts have held that a GAF scale reflects "a person's overall level of functioning *at or about the time of the examination*, not for a period of at least 12 consecutive months, which is required for a finding of impairment or disability." *E.g.*, *Shelton v. Astrue*, No. CV 09-06316-VBK, 2010 WL 2104162, at *3 (C.D. Cal. 2010) (emphasis added) (citing 20 C.F.R. §§ 416.905, 416.920(c)); *see also O'Connell v. Astrue*, No. EDCV 09-1545 RNB, 2010 WL 1573825, at *2 (C.D. Cal. 2010) (finding doctor's "one-time GAF assessment was not probative of whether claimant suffered from a disabling mental impairment that had lasted or was expected to last for at least 12 months"); *Skinner v. Astrue*, No. ED CV 09-00971-VBK, 2010 WL 546363, at *2 (C.D. Cal. 2010) (stating "GAF scale is intended to reflect a person's overall level of functioning at or about the time of the examination, not for a period of at least 12 consecutive months, which is required for a finding of impairment or disability").  However, this was not the reasoning provided by the ALJ, nor is it an argument posed by the Commissioner.

19 - FINDINGS AND RECOMMENDATION

### 4. __Lawrence Lyon, Ph.D.__

Dr. Lyon diagnosed Lewis with somatoform disorder and noted "Lewis clearly suffers from chronic anxiety and depressive symptoms."  R. at 456.  The Commissioner asserts Dr. Lyon mostly relied on Lewis's subjective complaints, and because Lewis lacked credibility, the ALJ acted properly when giving "little weight" to Dr. Lyon's opinion.[16]  This court disagrees.

First, as discussed below, the ALJ's finding that Lewis lacked credibility is not supported by substantial evidence.  Second, the ALJ relied, in part, on an inaccurate account of the record.  Here the ALJ reasoned, "[T]he claimant did not seek any further mental health care or intervention after September 2004 until she underwent another consultative psychological evaluation and testing with Lawrence Lyon, Ph.D., on November 15, 2006.  By my count, that's 24-plus months without mental health complaints or need for treatment . . . ."  R. at 23.  This reasoning, however, belies the record, which shows Lewis repeatedly saw Dr. Melby from September 2004 to November 15, 2006, for her depression, anxiety, and somatoform disorder.[17]  R. at 490, 493.

The ALJ also reasoned that "Dr. Lyon was completely left in the dark regarding the claimant [sic] opioid/narcotic and benzodiazepine medications usage and marijuana use."  R. at 24.  These statements, however, also contradict the record.  Here Dr. Lyon noted that Lewis

---

[16] An ALJ "may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

[17] Lewis visited Dr. Melby for mental health care between September 2004 and November 15, 2006.  *See* R. at 490 (Lewis saw Dr. Melby on December 3, 2004, for her anxiety); *see also* R. at 530 (Lewis visited Dr. Melby on June 20, 2005, about her anxiety and depression); R. at 523 (Lewis met with Dr. Melby on November 12, 2005, to discuss her depression).

began "smoking pot" around the seventh grade. R. at 452. He also noted Lewis "takes Vicodin 500's and Lorazepam for anxiety, which are prescribed by Dr. Melby." Id. Additionally, he acknowledged Lewis's history of Oxycodone, stating, "Ms. Lewis said that when she was being affected by the pain medication, she thought the radio or somebody was telling her what to do." R. at 455.

Third, the ALJ reasoned that Dr. Lyon based "his opinion predominantly on the claimant's subjective anecdotal reports." R. at 24. The record shows, however, that Dr. Lyon administered a number of tests, including the WAIS-III, Wechsler Memory Scale, Reitan Indiana Aphasia Screening Test, Trail Making Test Parts A and B, Minnesota Multiphasic Personality Inventory-2, Portland Digit Recognition Test, an "extensive file review," and a clinical interview with mental status examination. R. at 450.

Fourth, the ALJ reasoned that Dr. Lyon ignored "claimant's actual records; he ignores a Performance IQ score of 84 which casts the full scale score into serious question. He ignores the claimant's long standing narcotic medications usage, and he relies on the otherwise non-credible claim of sobriety by the claimant." R. at 24. However, there is no indication that Dr. Lyon ignored Lewis's Performance IQ score of 84. To the contrary, the record shows Dr. Lyon considered it, stating, "[Lewis's] Performance Scale IQ score falls in the Low Average range and her Full Scale IQ score falls in the Borderline range." R. at 454. He also noted that the "discrepancy between her Performance Scale and Verbal Scale IQ scores is statically [sic] significant and suggests that her nonverbal abilities are better developed than her verbal abilities. However, relative to her peers, she has significant difficulty in both verbal and nonverbal areas." Id. The record also does not support the ALJ's finding that Dr. Lyon ignored Lewis's "long

standing narcotic medications usage" because he documented, "[Lewis] takes Vicodin 500's and Lorazepam for anxiety, which are prescribed by Dr. Melby." R. at 452. Further, the ALJ's belief that Lewis's claim of sobriety is "non-credible" is not supported by substantial evidence where no doctor diagnosed her as abusing drugs or alcohol at the time Dr. Lyon rendered his opinion. In fact, Dr. Davis testified that he had sent out a urinalysis for Lewis, but it only "came back positive for benzodiazepines," a result of her Lorazepam prescription, and came back negative for marijuana. R. at 617.

Fifth, the ALJ reasoned that "with the exception of serious drug and alcohol abuse," there was "no basis in the record to support a GAF of 40, especially given the claimant's demonstrated capacity to continue working for an extended period since the alleged disability onset date, in addition to her testimony of still looking for work."[18] R. at 24. This is not a "specific and legitimate" reason, nor is it supported by substantial evidence, especially when considering that Lewis has been unable to maintain steady employment since her alleged disability onset date.

### 5. Non-Examining Medical Opinions

Lewis argues the ALJ erred by failing to mention or incorporate the findings of Disability Determination Service ("DDS") psychologists Dorothy Anderson, Ph.D., and Bill Hennings, Ph.D. The Commissioner responds the ALJ considered their opinions and "generally concurred with the consultants' findings." Def.'s Br. at 20.

"Social Security Ruling 96-6p explains the role of 'findings of fact made by State agency medical and psychological consultants and other program psychologists regarding the nature and

---

[18] A GAF score of 40 indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. *See* DSM IV at 34.

severity of an individual's impairment(s).'" *E.g.*, *Blaser v. Astrue*, Civ. No. 09-149-CL, 2010 WL 887306, at *11 (D. Or. 2010).  "An ALJ 'may not ignore these opinions and must explain the weight given to these opinions in their decisions.'"  *Id.* (citing SSR 96-6p at *1).

Here Dr. Hennings and Dr. Anderson reviewed the medical evidence and issued their assessment on October 26, 2004.  R. at 449.  They found Lewis "may encounter moderate limitations in understanding/remembering & carrying out detailed tasks requiring prolonged concentration." Id.  They also found Lewis "would best work in a situation, outside of a team setting where she could work independently with minimal co-worker interaction." Id.  They further found Lewis "would work well 'behind the scenes' . . . with only rare interaction with the general public." Id.  Finally, they assessed Lewis "could be expected to have moderate difficulties with criticism & would work best in an atmosphere on a 1:1 basis with an understanding lead worker." Id.

Contrary to Lewis's contention, the ALJ considered and evaluated Dr. Hennings and Dr. Anderson's opinions, and explained the weight given to their opinions.  He found that "in combination with considering the nature and severity of the claimant's mental functioning as assessed by the State Agency non-examining medical consultants[,]" Lewis had "medically determinable impairments." R. at 24-25.  He also stated that he considered the "assessment by the State Agency non-examining medical consultants, dated October 26, 2004" and gave "significant weight" to their treatment notes. R. at 27.  Lastly, giving Lewis "every benefit of doubt," the ALJ found she was limited to "simple, routine, repetitive 1-2-3 step type work" requiring "occasional interaction with the general public." Id.  Contrary to Lewis's contention,

23 - FINDINGS AND RECOMMENDATION

the record shows the ALJ discussed and incorporated the findings of Dr. Hennings and Dr. Anderson.

### 6. __Rob Schwartz, N.D., L.Ac., and Kendra Duby__

Lewis argues the ALJ erred by failing to provide reasons for disregarding the lay testimony of Dr. Schwartz and Kendra Duby when determining Lewis's RFC. The Commissioner responds that neither Dr. Schwartz nor Kendra Duby provided medical opinions, and therefore there was nothing for the ALJ to incorporate.

Lay testimony regarding a claimant's symptoms is competent evidence that the ALJ must consider unless he "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *E.g., Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d at 1055-56; *see also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Here Dr. Schwartz is a naturopath and licensed acupuncturist who became Lewis's family physician in February 2003, and was still treating Lewis when she applied for DIB and SSI benefits in March 2004. R. at 321. The ALJ could disregard his opinion if he gave germane reasons.[19] *See Delaney v. Comm'r of Soc. Sec.*, Civ. No. 09-807-AC, 2010 WL 5439740, at *9 (D. Or. 2010) (holding opinions of a naturopath and chiropractor "qualify as 'other source' opinions and, thus, may be rejected for germane reasons."). Kendra Duby was Lewis's therapist, R. at 427, and her opinions are also treated as lay testimony and may be rejected for germane reasons. *See, e.g., Christensen v. Astrue*, No. EDCV 07-1502-JTL., 2010 WL 4386934, at *3 n.1 (C.D. Cal. 2010).

---

[19] In her reply, Lewis concedes Dr. Schwarz is a lay witness medical provider. Reply at 33.

Here Dr. Schwartz stated in a letter dated April 29, 2004, "In my mind, [Lewis] is paranoid, with manic depressive states." R. at 321. He also stated, "I am of the opinion that she needs a thorough psychiatric evaluation done by the State. I also feel that she is incapable of any type of occupation at this time. . . . I do not feel that she can hold down any type of job for even a short period of time." Id. Kendra Duby opined that Lewis's symptoms meet "the criteria for generalized anxiety disorder." R. at 427. She also stated that Lewis "reported that she experiences chronic pain symptoms that interfere with her daily activities," but it was "difficult to gather a full history" because Lewis could not "remember many things, and [Lewis] attribute[d] this to her anxiety." Id. She also opined that Lewis's "suspicions about others, reluctance to confide in others because of fear it will be used against her, reading hidden meanings into benign remarks, preoccupation with unjustified doubts about others . . . meets [the] criteria for paranoid personality disorder." Id.

When an ALJ errs by failing to properly discuss competent lay testimony favorable to the claimant, as here, a reviewing court cannot consider the error harmless "unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Berjettej v. Astrue*, No. 09-CV-892-BR, 2010 WL 3056799, at *6 (citing *Stout v. Comm'r Soc. Sec. Admin*, 454 F.3d at 1053). Here this court cannot "confidently conclude" no reasonable ALJ could reach a different disability determination if Dr. Schwartz's and Kendra Duby's testimony were fully credited.

## C. Credibility

Lewis correctly asserts the ALJ erred when rejecting Lewis's complaints on the basis that she was not credible. *See* Pl.'s Opening Br. at 31. The ALJ is responsible for determining credibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

When there is no affirmative evidence showing the claimant is malingering, as here, the ALJ's reasons for rejecting the claimant's subjective testimony must be "clear and convincing." *E.g.*, *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citation omitted). The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Id.* at 724. General findings are an insufficient basis to support an adverse credibility determination. *Id.* The ALJ may consider many factors in weighing a claimant's credibility, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; . . . and (3) the claimant's daily activities." *E.g.*, *Smolen v. Chater*, 80 F.3d at 1284. The ALJ may also consider conflicting medical evidence, work record, and testimony that is vague or less than candid. *E.g.*, *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d at 1227; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1039-40 (9th Cir. 2007).

The ALJ found "that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. at 27. The ALJ stated several reasons for his conclusion. First, the ALJ reasoned that although Lewis testified on February 6, 2007, that she "only worked at Ace for 1-month before being fired in January 2007" and was "still looking for work," the evidence reflected "she was actually working

32-hours a week at another tavern (not Ace). . . . [And] [u]pon further questioning, as a

bartender, she acknowledge she works 6-to-9 hours a day, 2-to-4 days a week 'at the Elks.'"  R. at

26.

Here the record does not support the ALJ's reasoning that Lewis was working "at another

tavern" at the time of her first hearing on February 6, 2007.  At the second hearing held on May

8, 2007, the ALJ asked Kimberly Tucker, Lewis's attorney, whether Lewis was still working at

Ace Tavern.  R. at 604.  Ms. Tucker responded that Lewis was no longer working at Ace Tavern

because "she got fired or quit," but was working "32-hours a week" at a "new tavern."  Id.  There

is no inconsistency in Lewis's testimony because the record simply shows Lewis was no longer

working at "Ace Tavern," and was working at a "new tavern" at the time of her second hearing on

May 8, 2007.  Id.  Further, the record also shows Lewis worked at the Elks before her alleged

onset date from July 11, 2002, to January 27, 2004.  R. at 117, 606, 610.  The ALJ, however,

fails to provide any explanation on how this fact adversely affects Lewis's credibility.

Second, the ALJ reasoned that "claimant also acknowledged no difficulties in performing

her activities of daily living including doing household chores in her apartment, laundry,

vacuuming, cooking and driving."[20]  R. at 27.  However, the ALJ fails to demonstrate how

Lewis's ability to perform certain daily activities translates into her ability to work.  *See Gonzalez

v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990) (concluding ALJ erred when there was

"absolutely no finding to the effect that the ability to perform . . . daily activities translated into

the ability to perform appropriate work"); *see also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th

---

[20] Here Dr. Miller found Lewis able to care for her personal hygiene and grooming, live alone, clean her apartment, cook, go to the grocery store and buy food, pay her bills, drive a car, and use the phone.  R. at 328.

Cir. 2001) (concluding "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability"); *Wilton v. Astrue*, No. CV 09-5706 JCG, 2010 WL 4916592, at *8 (C.D. Cal. 2010) (holding ALJ failed to demonstrate how plaintiff's ability to perform certain daily activities translated into an ability to work); *Norton v. Astrue*, No. CV 09-01358-PHX-MHM, 2010 WL 3842269, at *12 (D. Ariz. 2010) (disagreeing with ALJ's findings concerning plaintiff's "credibility as to the intensity, persistence, and limiting effects of [p]laintiff's symptoms," in part, because ALJ failed to explain how plaintiff's daily activities translated into an ability to perform in a work setting).

Third, the ALJ reasoned Lewis "did not testify that she was on the Oregon State Medical Marijuana Program which is what she told Dr. Melby," "did not proffer any testimony regarding her shopping for doctors and trying to get Vicodin over the internet," and "did not testify to any specific disabling physical or mental functioning symptoms." R. at 27. The ALJ, however, did not ask Lewis any questions regarding these issues at the hearings. In addition, Lewis was not even present at the May 8, 2007. "The ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . even when the claimant is represented by counsel.'" *E.g. Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (citation omitted). An ALJ's duty to develop the record further is triggered only when, as here, there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). Further, "[i]n cases of mental impairments" the ALJ's duty to clarify and develop the record "is especially important." *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991); *see also Tonapetyan*, 242 F.3d at 1150

28 - FINDINGS AND RECOMMENDATION

("ALJ's duty to develop the record fully is . . . heightened where the claimant may be mentally ill and thus unable to protect [his] own interests.").

Finally, the ALJ stated that he concurred "with the opinion of Dr. Davis and the opinions of the State Agency non-examining medical consultations that [Lewis] has been vague about current use of both drugs and alcohol." R. at 27.  He also stated that consistent with "assessments by medical providers and in phone conversations with the State Agency and consultative examiners, [Lewis] has consistently demonstrated traits of evasiveness, secrecy and inconsistencies in alleged symptoms" Id.  The record when read as a whole, however, indicates Lewis's vagueness, evasiveness, secrecy, and inconsistencies are associated with her mental disorders.  Further, the ALJ's selective reading of the record, to justify his adverse credibility finding, does not amount to "specific, clear and convincing" reasons.

If a claimant produces objective medical evidence that he suffers from an ailment that could cause pain, "'the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so.'"  *E.g.*, *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citation omitted).  The ALJ may not reach a conclusion first and then justify it by ignoring competent evidence in the record.  *See Regennitter v. Comm'r*, 166 F.3d 1294, 1297 (9th Cir. 1999) ("inaccurate characterization of the evidence" constitutes error); *Gallant v. Heckler*, 753 F.2d at 1456.

Here Dr. Davis testified that various doctors noted Lewis's communication "has been poor, inconsistent, and often vague."  R. at 614.  He, however, also explained Lewis is "not very capable of describing what she's doing, deciphering verbal instructions, auditory instructions and so forth."  Id.  He also noted the record indicated Lewis did not "seem to understand the

29 - FINDINGS AND RECOMMENDATION

questions very well," which was "a function probably, of her poor IQ," and "one of the reasons

why [there was a] lack of cooperation noted here and there."  R. at 615-16.  In addition, although

Dr. Miller noted Lewis was "very vague" about her alcohol consumption and drug use, she also

noted Lewis "is very distracted by her own thoughts," her "anxiety [was] interfering with her

ability to think and to make decisions," and that her "paranoia interfered with her ability to

answer questions posed in [the] assessment."  R. at 327.  Dr. Becker noted that Lewis was

"somewhat vague and evasive" regarding her past medical evaluations.  R. at 331.  However, he

also observed Lewis had "scattered and tangential speech," and opined "it was clear that [Lewis's]

history was quite complex and complicated by significant psychological factors."  Id.  During a

visit to the emergency room on March 6, 2004, Dr. Lapidus noted Lewis "came in with a very

bizarre and vague history of abdominal pain."  R. at 338.  However, he also noted Lewis had

"some bizarre psychiatric features," and recognized that Lewis may have "psychiatric illnesses."

R. at 339.  Similarly, Dr. Lyon also stated that Lewis "was a rather poor historian in that she

frequently left out important aspects of her history, often due to a lack of understanding of the

questions asked."  R. at 450.  Notably, he also stated that Lewis "interpreted questions in an

unusual manner, causing her answers to be somewhat distorted."  R. at 450-51.  Dr. Perri stated

that Lewis's "[t]hought processes are vague at times and tangential at other times."  R. at 408.

Kendra Duby wrote Lewis's "suspicions about others, reluctance to confide in others because of

fear it will be used against her, reading hidden meanings into benign remarks, preoccupation with

unjustified doubts about others . . . meets the criteria for paranoid personality disorder. . . . [H]er

suspicious nature may keep her from answering questions completely."  R. at 427.  When read as

a whole, the medical record does not undermine Lewis's credibility.  Rather, it provides an

30 - FINDINGS AND RECOMMENDATION

alternative and reasonable explanation for Lewis's vagueness, evasiveness, secrecy, and inconsistencies.[21]

## II. **Reverse and Remand**

This court concludes that due to the ALJ's errors, the ALJ's decision must be reversed. The court must now consider whether the matter should be remanded for further proceedings or for an award of benefits. The decision to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). The court's decision turns on the utility of further proceedings.

"[A] remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits." *Holohan v. Massanari*, 246 F.3d at 1210. The rule recognizes "the importance of expediting disability claims." *Id.* "[I]n cases in which it is evident from the record that benefits should be awarded, remanding for further proceedings would needlessly delay effectuating the primary purpose of the Social Security Act, 'to give financial assistance to disabled persons because they cannot sustain themselves.'" *Id.* (quoting *Gamble v. Chater*, 68 F.3d 319, 322 (9th Cir. 1995)).

A reviewing court should credit evidence and remand for a finding of disability and an award of benefits if: (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues to be resolved before a determination of disability

---

[21] The Commissioner also asserts Lewis's credibility is adversely affected because she tampered with the evidence. He cites a portion of the record where the ALJ noted that Lewis "appears to have made pen-and-ink scratch-outs of the assessment somatoform disorder in Dr. Melby's visit notes while increasing her pain complaints and escalating her persistent request/demand for Vicodin." R. at 20. A review of the records, however, does not reveal who made the "scratch-outs" and additional notations. Accordingly, the Commissioner's argument is not supported by substantial evidence.

can be made; and (3) it is clear from the record that the ALJ would be required to find the

claimant disabled if the evidence in question were credited. *Smolen v. Chater*, 80 F.3d at 1292.

Under these standards, a remand for a finding of disability and an award of benefits is

appropriate in this case because the ALJ erroneously found Lewis did not meet Listing 12.05C

and 12.08. Accordingly, Lewis is presumed to be disabled, and benefits should be awarded. *See*

*Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990); *see also Holohan v. Massanari*, 246 F.3d

at 1211 (remanding case to the district court with instructions to remand to the ALJ for an award

of benefits because the record "contain[ed] evidence that support[ed] a finding that [claimant

met] the Appendix 1 listings").

Further, when evaluating the opinions and conclusions of Dr. Melby and Dr. Schwartz,

and the scope of Lewis's disorders, it is clear from the record that Lewis is incapable of full-time

employment. Here Dr. Melby opined that Lewis "would be unable to function in a regular job

due to her impairments." R. at 503. Similarly, Dr. Schwartz opined in a letter dated April 29,

2004, that Lewis was "incapable of any type of occupation at this time" and would be unable to

"hold down any type of job for even a short period of time." R. at 321. In addition, two of

Lewis's treating physicians, Dr. Melby and Dr. Lyon, diagnosed Lewis with disabling

impairments. Dr. Melby repeatedly diagnosed Lewis with chronic pain, somatoform disorder,

fibromyalgia, and depression. Similarly, Dr. Lyon diagnosed her with somatoform disorder and

depression.

When it is clear from the record that the ALJ would be required to find the claimant

disabled if the evidence in question were credited, additional proceedings are unnecessary to

determine plaintiff's entitlement to benefits. *Smolen v. Chater*, 80 F.3d at 1292 (concluding

32 - FINDINGS AND RECOMMENDATION

remanding for an award of benefits is appropriate where the record is fully developed, and further proceedings "would serve no useful purpose").

The record establishes Lewis cannot perform any substantial gainful activity that exists in the national economy, and the case need not be returned to the ALJ for further proceedings. *See Benecke v. Barnhart,* 379 F.3d at 595. "Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Havrylovich v. Astrue*, Civil No. 09-1113-HA, 2011 WL 284731, at *8 (D. Or. 2011) (citation omitted). As the *Benecke* court summed up:

> Remanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.

*Havrylovich v. Astrue*, Civil No. 09-1113-HA, 2011 WL 284731, at *9 (citation omitted).

## CONCLUSION AND RECOMMENDATION

For the reasons stated above, the ALJ's decision should be REVERSED and REMANDED for the immediate calculation and award of benefits.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due March 1, 2011. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

/////

33 - FINDINGS AND RECOMMENDATION

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

DATED this 15th day of February, 2011.

/s/ Patricia Sullivan

Patricia Sullivan

U.S. Magistrate Judge